#24437-r-SLZ

**2007 SD 121**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

RALPH WILLIAM BOYER,                                     Plaintiff and Appellant,

>       v.

KATHRYN DENNIS,                                     Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE THOMAS L. TRIMBLE
Judge

\* \* \* \*

ROLAND E. GROSSHANS                         Attorney for plaintiff
Rapid City, South Dakota                         and appellant.

TINA M. HOGUE of
Finch, Bettmann, Maks & Hogue, P.C.             Attorneys for defendant
Rapid City, South Dakota                         and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON OCTOBER 1, 2007

OPINION FILED **11/20/07**

ZINTER, Justice

[¶1.]    Ralph Boyer appeals the circuit court's judgment concluding that Boyer's easement for ingress and egress over Kathryn Dennis' property was extinguished by nonuse and intent to abandon.  We reverse.

[¶2.]    Boyer and Dennis own adjoining parcels of land.  The northern border of Boyer's property (Lot B) is the southern border of Dennis' property (Lot L[1]).  Boyer purchased Lot B with his wife Angela on May 15, 1982, from Dorothy Storm.  Storm acquired the property from her husband Clemens Storm on December 20, 1976.  Clemens Storm purchased Lot B from Arthur and Katherine Heligas on March 29, 1973.

[¶3.]    While Arthur and Katherine Heligas were owners of Lot B, they also were owners of Lot L.  During the time they owned both lots, they granted an express easement for ingress and egress over Lot L for the benefit of Lot B.[2]  Dennis

---

1.    Although Dennis' property also includes 34 feet of Lot M directly to the west of Lot L, for simplicity we refer to the property in its entirety as Lot L.

2.    A visual depiction of the properties and easement follows:

(continued . . .)

acquired ownership of Lot L from Arthur Heligas on August 4, 1972. The deed acknowledged the easement. At the time the property was conveyed, a wire fence separated Lots B and L. In 1973, Dennis built her home on Lot L.

[¶4.]     After Dennis purchased Lot L, Arthur Heligas never utilized the easement for access to Lot B. Instead, Heligas accessed Lot B through two alternative routes: (1) via Canyon Lake Drive, Lilac Lane, and a sixteen foot easement over a lot south of Lot B; or (2) via Lakeview Drive, crossing private property directly south of Lot B (the Alternate Routes).

[¶5.]     When Clemens Storm purchased Lot B in 1973, Storms sporadically used the easement. The majority of the time they used the Alternate Routes to access Lot B. Dennis had informed Dorothy Storm that Dennis was not in agreement with Storm's use of the easement for ingress and egress. When Dorothy

---

(. . . continued)



Storm became title holder of Lot B in 1976, the Storms discontinued all use of the easement.

[¶6.] On May 15, 1982, Dorothy Storm sold Lot B to Boyers. Although Boyers purchased the property, Angela's parents, the Winchesters, occupied the property until the Boyers divorced in 2006. In that same year Ralph Boyer became the sole owner of Lot B, he moved onto the property, and made his first personal attempt to utilize the easement on Lot L for ingress and egress to Lot B. Boyer's attempt to utilize the easement was the catalyst for the suit, and the Winchester family's use or nonuse of the easement during their occupancy from 1982 to 2006 was the focus of the trial.

[¶7.] The trial court found: (1) that from May 15, 1982 until April 1, 2006, neither Boyer nor the Winchesters used the easement as a means of ingress and egress to Lot B, rather they accessed Lot B via the Alternate Routes; (2) that Winchesters impeded the use of the easement by placing "junk cars" and wood piles at its entry; (3) that Boyer/Winchesters failed to maintain the easement, allowing bushes, shrubs, and lawn to encroach; and (4) that Winchesters had closed and bolted shut the easement's access gate, essentially destroying the right to use the right-of-way. Although there was evidence of extremely limited vehicle use and some foot and bicycle use during this time, the court concluded that foot and bicycle traffic of a "kid" was not the type of ingress and egress contemplated by the express grant. The court stated, "[t]he fact that some kid walks down the road or rides his bicycle down it, I don't think that's the intended use of the easement." The court also discounted the Winchesters' vehicular use of the easement, some of which was

the result of city construction on the Alternate Routes. The trial court ultimately concluded that Boyer's easement had been extinguished.

[¶8.] Boyer appeals, contesting both the trial court's findings of fact and conclusion of law. "'We review a trial court's findings of fact under a clearly erroneous standard.' Clear error is shown only when, after a review of all the evidence, 'we are left with a definite and firm conviction that a mistake has been made.'" Graves v. Dennis, 2004 SD 137, ¶9, 691 NW2d 315, 317 (citation omitted). Conclusions of law are reviewed de novo. Northstream Inv., Inc. v. 1804 Country Store Co., 2007 SD 93, ¶8, 739 NW2d 44, 47.

[¶9.] An easement may be extinguished by "the performance of any act upon either tenement, by the owner of the servitude, or with his assent, which is incompatible with its nature or exercise." SDCL 43-13-12. Intent to abandon the easement is also required.

> Under this statute, "there must be an affirmative act of abandonment on the part of the owner of the easement to extinguish the easement. Mere nonuse of an easement, created by grant, is insufficient to satisfy this requirement." Hofmeister v. Sparks, 2003 SD 35, ¶13, 660 NW2d 637, 641 (citing Clark v. Redlich, 147 CalApp2d 500, 305 P2d 239, 244 (1957)). However, a substituted access may serve as evidence of abandonment, but that by itself is not dispositive. Id. Use of a substitute road may be evidence of an abandonment of the old road; however, "[t]he mere use of a new right-of-way will not extinguish the old. There must also be an abandonment by non-use of the old right-of-way." Id. (quoting Shippy v. Hollopeter, 304 NW2d 118, 122 (SD 1981)). Those claiming abandonment carry the burden of showing by clear and convincing evidence an intent to abandon the easement. Cleveland v. Tinaglia, 1998 SD 91, ¶26, 582 NW2d 720, 725; see Mueller v. Bohannon, 256 Neb 286, 589 NW2d 852, 859 (1999).

*Graves*, 2004 SD 137, ¶11, 691 NW2d at 318. The clear and convincing evidence of intent to abandon was emphasized in *Graves*:

> Failure to take advantage of a servitude benefit, even for a lengthy period, is seldom sufficient to persuade a court that abandonment has occurred. Some additional action on the part of the beneficiary inconsistent with continued existence of the servitude is normally required, although the amount of additional evidence required tends to diminish as the period of nonuse grows longer. In cases where a very long period of time has passed, abandonment may be found even without other evidence of intent.

*Id.* ¶12, 691 NW2d at 318 (quoting RESTATEMENT (THIRD) OF PROPERTY, § 7.4 cmt. c (2000)). Ultimately, because of the nature of these cases: "A finding of abandonment is usually based on circumstantial evidence rather than on direct expressions of intent . . . ." *Id.*

[¶10.] Boyer argues that the acts of the Winchesters, the tenants in possession, did not reflect an intent to abandon the easement. He specifically contends the trial court erred in finding that the easement had not been used for ingress and egress from 1982 through 2006. With respect to the trial court's conclusions, he contends that the trial court erred as a matter of law in concluding that the pedestrian, bicycle, and sporadic vehicular use did not constitute ingress and egress sustaining his easement. We agree with Boyer.

[¶11.] In reaching its decision, the trial court placed significant weight on the fact that at some points in time Winchesters closed, and at one point even bolted, the access gate to the easement. This conduct, however, did not reflect an intent to abandon. The testimony was undisputed that the gate was shut to stop a neighbor's (a non-dominant tenant's) constant vehicular use of the private easement

and to keep trespassing children out of Winchesters' workshop. Rather than reflecting an intent to abandon, these actions reflected an intent to protect Lot B from trespassers and to limit use of the private easement to those individuals who had a right to use it. Moreover, in 1994, the chain on the gate was exchanged for a rope to permit access to the easement by the Winchesters' children who used it to get back and forth to school and deliver newspapers. This gated use by the possessors of the dominant tenement reflected intent to use the easement for ingress and egress.

[¶12.] The trial court also found that foliage had encroached on the easement, and on occasion junk cars and wood piles partially or temporarily blocked its entrance. This encroachment and storage of items that partially or temporarily blocked the easement was not, however, dispositive evidence of abandonment.

> It has often been held that an unintentional or a partial blocking is insufficient to disclose abandonment and so long as the purpose of ingress and egress is not substantially interfered with, no rights of the owners are lost. . . . As a general rule, a mere neglect of the condition of a way is not enough in addition to nonuser to show abandonment.

Harrington v. Kessler, 247 Iowa 1106, 1111, 77 NW2d 633, 635 (Iowa 1956) (citations omitted). We conclude that the trial court erred in viewing the encroachment and Winchesters' conduct of storing these items in front of the easement as demonstrating intent to abandon. All items alleged to have been stored were moveable, they were not stored the entire twenty-four year period, and as we explain below, none of this conduct substantially precluded ingress and egress. Therefore, the encroachment and the storage of these items did not clearly and convincingly evince the intent to permanently abandon the easement.

[¶13.]     We finally observe that there was uncontested evidence that this easement was used for ingress and egress between 1982 and 2006.  The record reflects a number of examples of the tenants' use of the easement for ingress and egress by foot, bicycle and vehicle.  With regard to vehicle use, Jeff Winchester was specifically asked if from 1982 to 1986 he, his father or brothers had used the "easement for ingress and egress to the property." Although Jeff indicated that the easement had been used for ingress and egress "seldom" or only "[o]nce in awhile," he testified that they used the easement at times when "moving vehicles out and about."  Jeff also testified that the easement had been used by the entire family when the Alternate Routes were torn up by a utility company in 1988.  Additionally, a neighbor testified that in 1986, "the gate was open and cars were going back and forth on the easement."  Finally, the evidence reflected that Boyer's former father-in-law used the easement for ingress and egress prior to his death in 1997.[3]

[¶14.]     With respect to other uses, the evidence was uncontested that in 1983, Jeff, who was in ninth grade at the time, used the easement "daily" on his bicycle, to get to and from high school.  He also used the easement to deliver papers in 1984.  In 1998, Loren Winchester, Jeff's child and tenant of Lot B, used the easement for ingress and egress to catch the Headstart bus.  The bus would actually "stop over on the easement" (on the north end of the easement directly in front of Dennis' house) to pick up Loren.  Finally, Loren, along with his parents, used the easement

---

3.     Although evidence established that the City of Rapid City had provided a temporary easement over Lots B and L for the entire neighborhood's use at one time, none of the above listed uses were associated with this temporary

(continued . . .)

"regularly" to deliver newspapers and occasionally to pick up the family's mail around 2002 through 2003.

[¶15.] These uses to get to and from school and Headstart, to pick up mail, and to deliver newspapers demonstrated use for ingress and egress by the tenants in possession. Furthermore, these uses cannot be discounted merely due to the type of transportation or the age of the tenant. The easement grant did not limit ingress and egress to vehicular traffic for adults. Because vehicular use for adults was not the exclusive use specified by the grant, "bicycles, handcarts, and foot travel must also be given consideration" when evaluating whether the owner intended to abandon the easement. *Harrington*, 247 Iowa at 1112, 77 NW2d at 636.

[¶16.] We conclude the trial court erred as a matter of law and fact in finding that the easement had not been used for ingress and egress for twenty to thirty years. Although Boyer's tenants accessed Lot B via the Alternate Routes most of the time, the trial court erred as a matter of law in failing to give consideration to the uses that did occur. Those uncontested uses did not reflect clear and convincing evidence of nonuse and intent to abandon the easement.

[¶17.] Reversed.

[¶18.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.

---

(. . . continued)
easement. The temporary easement was strictly confined to a 30 day period around July of 2004.